## Jerry DENHAM v. STATE of Arkansas

5589                                    466 S. W. 2d 469

Opinion delivered May 10, 1971

*Louis W. Rosteck,* for appellant.

*Ray Thornton,* Attorney General; *Garner L. Taylor, Jr.,* Asst. Atty. Gen., for appellee.

J. Fred Jones, Justice. This is an appeal by Jerry Denham from an order of the Pulaski County Circuit Court denying his petition for post-conviction relief in the form of habeas corpus. The trial court record enables us to dispose of the matter without a great deal of difficulty. We affirm the judgment of the trial court.

Denham was charged with first degree rape of a little Negro girl who had been babysitting with Denham's sister-in-law's children. Competent counsel was appointed to represent him. He entered a plea of not guilty and not guilty by reason of insanity. He was found without psychosis upon examination at the State Hospital; and after a jury was empaneled and selected to

try his case, the prosecuting attorney agreed to waive the death penalty upon a plea of guilty. Denham entered his plea of guilty and was sentenced to the penitentiary for life.

Denham alleged in his petition that his constitutional rights were violated in that he was denied the assistance of counsel; that he was never given a copy of indictment, or information, or bill of particulars; that he was denied counsel at police interrogation; that trial counsel finally appointed for him was ineffective; that statements made under duress were admitted in evidence against him; and finally, that he was denied the right to appeal his conviction. The petition was signed by Denham over a jurat as follows:

"Sworn and subscribed this 22nd day of September, 1970. /s/ Jack Jones—My Commission Expires April 23, 1974."

An evidentiary hearing on the petition was held in the trial court on the 28th day of October, 1970, at which time Denham appeared with his court-appointed counsel and was permitted to testify in support of his petition. At the outset, however, the record made at the original trial of his case was read to him, which reflected that he was charged by information filed on June 27, 1967; that on July 3, 1967, Harry Robinson and Allan Dishongh were appointed to defend and his case was passed to July 10 for arraignment; that on July 11, 1967, he entered a plea of not guilty and not guilty by reason of insanity; that he was then sent to the State Hospital for psychiatric examination; that on July 25, 1967, he was returned to the court with a certificate from the State Hospital "without psychosis"; that on July 31, 1967, a jury trial was set for October 26 and 27; that on October 23, 1967, Allan Dishongh was relieved as attorney. Under date of October 26, 1967, the record made in the trial court reveals as follows:

"Both parties announced ready for trial; drawn and struck jury; death penalty was asked by the State; the jury was empaneled and sworn; death penalty

was waived by the State; plea of not guilty withdrawn, plea of guilty entered, jury instructed to return a verdict of guilty and assess a life sentence; verdict, by direction of Court, guilty, life, Max F. Atwood, Foreman; and time for sentencing waived and defendant sentenced and committed."

The record before us reveals that on September 25, 1970, Mr. Louis Rosteck was appointed to represent the petitioner on his petition for habeas corpus. In support of his petition Denham testified that he did not know that Mr. Dishongh was appointed to represent him; that he does not recall whether Mr. Dishongh was in the courtroom when he entered his plea of guilty to the rape charge or not; that he does not recall whether he ever talked to Mr. Dishongh but does not think that he did. He testified that he recognized Mr. Robinson as being his attorney; that he remembers that he first pleaded not guilty to the charge of rape; that he believes it was not guilty by reason of insanity as well. The pertinent answers to questions are as follows:

"Did your attorney, or attorneys, ever talk to you concerning the trial? Did you have any conferences with them, with either of them?

A. Yes. I had one or twice with Mr. Robinson, and I don't remember what it was about though.

Q. Well, did you talk about the nature of the case itself?

A. Yes, sir, I imagine we did. I just don't remember, it's been so long ago.

Q. And did you make it known to him as to what your plea would be?

A. Yes, sir.

Q. Now, I would like for you to be more specific since you are alleging here, one of the grounds here, that you were coerced into making a plea

of guilty. I wish—I don't hardly know how to ask the question, but I wish you would tell the Court here as to what you base that on?

A. What do you mean?

Q. You have alleged here that you were coerced into entering a plea of guilty.

THE COURT: Somebody forced you to enter a plea of guilty.

THE WITNESS: Well, I had to plead guilty, or get the electric chair.

Q. (Mr. Rosteck, Continuing) Tell the Court how that came about?

A. Well, anybody with any sense would say that is my point.

Q. Who came to you and told you that you had to enter a plea of guilty?

A. I don't rightly remember.

Q. Did your attorney, or court-appointed attorney, recommend to you to enter a plea of guilty?

A. I believe he did; said it would be best to plead guilty.

Q. To plead guilty?

A. Yes, sir.

Q. Are you sure about that now?

A. Yes, sir, I am sure.

Q. Was any of the officers, either the county jail or the county officers, city officers, or state

officers, did any of them threaten, coerce you in any manner?

A. No, sir.

Q. As to entering a plea of guilty to this charge?

A. No, they didn't.

Q. Did you at any time make it known to your attorney that you wanted to have a jury trial, or did not want to have a trial?

A. Yes, sir, we was going to have a trial and then we come in here, this room here, and I believe that is when he told me it would be best to plead guilty because I had all of those people in the courtroom on me, and it was in the papers and all that stuff; told myself it would be best to plead guilty instead of getting the electric chair.

Q. Or get the electric chair?

A. Right.

\* \* \*

Q. Let me ask you this. Do you recall appearing in the courtroom with your attorney, or attorneys, and that a jury was selected?

A. Yes, sir, a jury was selected.

Q. They were selected and seated in the jury box?

A. Yes, sir.

Q. You recall that?

A. Yes, sir.

Q. After the jury was sworn in by the clerk, you recall that?

A. Yes, sir.

Q. Jury being sworn in?

A. Yes, sir.

Q. What transpired from that point on?

A. Well, I don't really remember. That's when we come in here and started talking. I don't know.

Q. Was there any indication to you at the time you went to trial that the Prosecuting Attorney's office, or the State, was asking the death penalty?

A. Yes, sir, they was to start with.

Q. You were aware of that?

A. Yes, sir.

Q. So your attorneys were ready to have a jury trial at that point?

A. Yes, sir.

Q. At some point after the jury was empaneled, you came into the Judge's Chambers? Is that correct?

A. Yes, sir.

Q. And, at that time, be specific on what you're saying now, and think carefully, what happened, if anything happened, that you can recall, either coerced, or under duress, or threatened, or anything of that nature, to make you change your plea from not guilty to guilty?

A. Well, I wasn't really, what you say threatened. Like I told you while ago, the man said it

would be best to plead guilty and I know it would be myself.

\*   \*   \*

Q. (Mr. Rosteck, Continuing) Mr. Denham, you mentioned here that you did—you never received a copy of the bill of particulars. Was this requested by you?

A. No, sir.

Q. Do you know what a bill of particulars is?

A. I really don't.

Q. You alleged in here that you requested, you intimated that you didn't receive it, neither did you receive a copy of the information?

A. I didn't receive one.

Q. Did you make any formal request of your attorney for a bill of particulars?

A. No, sir.

Q. Did you ask your attorney for information to be more specific as to the crime itself?

A. I don't know.

Q. To get you any information?

A. No.

Q. Were you aware at the time that you were brought to trial what you were charged with?

A. Yes, sir.

Q. The nature of the crime?

A. Yes, sir.

Q. And also the penalty for which you could receive?

A. Yes, sir.

Q. You were aware of all that at that time?

A. Yes, sir.

Q. Now, you further allege, and this is the last point here, that you had ineffective assistance in counsel. Now, I wish you would be more specific and say why you feel that you did not have effective assistant counsel?

A. Well, really, I don't believe I could have had any court-appointed, or any other kind, the way they were all right in court and all that stuff on me. I didn't have a chance to start with.

Q. When you say ineffective assistance, what do you actually mean by that?

A. Well, I didn't even—I don't know. I didn't write that. That lawyer up there wrote it for me.

THE COURT: You got a jailhouse lawyer, or a regular lawyer?

THE WITNESS: I don't know. I guess sorta jailhouse lawyer.

Q. (Mr. Rosteck, Continuing) Well, for the matter of record here, did you receive—

THE COURT: (Interposing) How much did he charge you for writing it?

THE WITNESS: He didn't.

THE COURT: I didn't know if he was practicing law without a license, or not. Proceed.

Q. (Mr. Rosteck, Continuing) Did you receive counsel from your court-appointed attorneys? Did they counsel with you?

A. Yes, sir, Mr. Robinson did.

Q. Do you feel like there was anything they could have done which they didn't do?

A. No, sir, I don't believe they could.

Q. In other words, you feel that they were as effective as they could possibly have been under the circumstances for which you were charged?

A. Yes, sir.

Q. I will ask you one last question. Is there anything else, or any statement that you would like to make to support your petition, anything that I have not asked you and anything you want to say?

A. No, sir, not that I know of."

On cross-examination the appellant reiterated that he was afraid the jury would assess a death penalty, and that he knowingly and intentionally entered his plea of guilty with the understanding that he would get a life sentence to the penitentiary, rather than take the chance of getting a sentence of death in the electric chair. The assistant prosecuting attorney then proceeded on cross-examination to elicit the following answers to the following questions:

"Q. Now, your attorney went into a great deal of detail in explaining this to you, did he not?

A. Well, he didn't go into all that; he just told me.

Q. You agreed to it, did you not?

A. Yes, I agreed to it.

Q. You agreed to it because you had done the act that you were charged with? Is that not true?

A. No, sir, I didn't do the act."

On redirect examination Mr. Denham testified as follows:

"Q. Mr. Denham, you indicated that you did not commit this particular crime. I will ask you specifically, did you, or did you not —are you, or are you not stating that you were, or were not, guilty of the crime of rape?

A. I pleaded guilty then, yes.

Q. You plead guilty to it, and you are admitting today that you were guilty of it?

A. No, I am admitting I wasn't guilty of it, but I pleaded guilty instead of getting the electric chair, which I would have got.

Q. Now, so that I am sure I am right on this, you plead guilty because you were in fear of getting the electric chair?

A. That's right.

Q. And what induced you to plead guilty?

A. If you read the papers, the papers would tell you why."

The court reporter who participated at the original trial on the plea of guilty, as well as Mr. Harry Robinson who represented the appellant at his original trial, testified. The substance of their testimony was that after the jury was empaneled to try the defendant on a charge of first degree rape, the prosecuting attorney agreed to waive the death penalty and recommend life imprisonment if Denham desired to enter a plea of guilty rather

than risk his chances with a jury. Mr. Robinson's qualifications, as set out in the record, show that he had been an attorney for 40 years; that he had served as deputy prosecuting attorney; had served as a municipal judge as well as a circuit judge; and that he had participated in the trial of many capital cases.

Mr. Robinson testified that he discussed the case with the appellant and his family on many occasions prior to trial; that after the jury was empaneled and sworn to try the case, he discussed a plea of guilty with the prosecuting attorney; that when the prosecuting attorney agreed to waive the death penalty, he felt that it was to his client's best interest that he enter a plea of guilty and accept a sentence to life imprisonment.

The pertinent facts surrounding the original crime are only before us as referred to by Mr. Robinson in his testimony. The substance of his testimony is that the crime itself had complicated features in that the victim of the crime was a little Negro girl who was babysitting for the appellant's sister-in-law; that following the crime she was denied admittance to a local hospital because the doctor in charge did not want to become involved, and the crime itself as well as the subsequent events was attended by considerable statewide publicity. Mr. Robinson concludes as follows:

> "I just told him the facts as it was. He had a rough case, coupled with some other—rape itself was rough, but all this other hullabaloo, it was just a rough case, and Denham understood it.
>
> \*   \*   \*
>
> I could have discussed it with him a hundred times and never would come up with but one conclusion —you better plead if you could. It was that kind of case to me."

Mr. Robinson testified that he filed a motion requesting a list of the witnesses the state intended to use at the trial, but that after a plea arrangement was

worked out with the prosecuting attorney, the motion became moot. As to the alleged failure to furnish a bill of particulars and to appeal, Mr. Robinson testified as follows:

> "Q. Did you ever file a motion for a bill of particulars?
>
> A. No, I didn't need it. I didn't think. Now, a bill of particulars is either to aggravate, or delay, the Prosecuting Attorney, or it's very seldom ever filed for, actually for information.
>
> THE COURT: Let me ask you this. Did this man request you to appeal this case? He said something in there about failure to take his appeal.
>
> THE WITNESS: No, sir, he was well satisfied under the circumstances. * * *
>
> Q. (Mr. Rosteck, Continuing) Let me ask you you one last question. If, today, you had the same situation, would your decision be the same?
>
> A. Absolutely."

Mr. Denham was offered the opportunity to direct questions to Mr. Robinson concerning the petition he filed, but he declined to do so.

The judgment is affirmed.